(C. D. 268)

Julius Forstmann & Co. *v.* United States

United States Customs Court, Second Division

(Decided December 20, 1939)

*Strauss & Hedges* (*Eugene F. Blauvelt* of counsel) for the plaintiffs.
*Joseph R. Jackson,* Assistant Attorney General (*William Whynman, Richard H. Welsh,* and *Richard E. FitzGibbon,* special attorneys), for the defendant.

Before Tilson, Kincheloe, and Dallinger, Judges

Dallinger, Judge: This is a suit against the United States, arising at the port of New York, brought to recover certain customs duties alleged to have been improperly exacted on a particular importation of textile machines and parts thereof. Duty was levied thereon at the rate of 40 per centum ad valorem under the provision in paragraph 372 of the Tariff Act of 1930 for "all other textile machinery, * * * not specially provided for" and parts thereof. It is claimed that said merchandise is properly dutiable at the rate of 35 per centum ad valorem under the provision in paragraph 353 of said act for "articles having as an essential feature an electrical element or device," or at 27½ per centum ad valorem under said paragraph 372 as machines or parts thereof not specially provided for.

This case was originally called for hearing on January 11, 1937, and at a subsequent hearing held on March 10, 1937, was submitted for decision on the following agreed statement of facts:

It is stipulated and agreed between counsel that the merchandise covered by this protest consists of one wet decatizing machine, two double nap raising machines, and two cloth tentering machines.

It is further stipulated that for the purposes of this case it is agreed that the foregoing machines are textile machines within the provision of paragraph 372 of the Tariff Act of 1930 reading, "all other textile machinery, finished or unfinished, not specially provided for," but are not knitting, braiding, lace-braiding, or insulating machines, or similar machines.

It is further stipulated that the machines covered by this protest are articles having as an essential feature an electrical element or device within the description in paragraph 353 of the Tariff Act of 1930.

And it is further stipulated that all the machines covered by this protest are composed in chief value of metal.

Upon this agreed statement of facts in the case of *Julius Forstmann & Co.* v. *United States*, 72 Treas. Dec. 482, T. D. 49222, this court, in passing upon the law in the premises, decided that the provision for textile machinery not specially provided for in paragraph 372 was more specific than the provision in paragraph 353 for articles having as an essential feature an electrical element or device.

The plaintiffs moved for a rehearing, which motion was denied.

The plaintiffs, thereupon, filed an appeal with the United States Court of Customs and Patent Appeals. The latter tribunal on February 6, 1939, in the case of *Julius Forstmann & Co.* v. *United States*, 26 C. C. P. A. 336, C. A. D. 37, without passing upon the question of law involved, reversed the decision of this court and remanded the case for a new trial, with the following statement:

* * * Here we have a stipulation that a statute shall receive a stated application which necessarily involves interpretation. We hold, therefore, that it is a stipulation of law, not binding on the court, and we will not consider it.

This court encourages proper stipulations as an aid in expediting litigation. It should not be a difficult matter in the instant case to stipulate the clear ordi-

nary facts, describing adequately the imported merchandise as to structure and use. The court could then apply the law to the facts.

We are of opinion that we do not have sufficient facts before us to decide this appeal upon its merits. Furthermore, the stipulation attempts to bind us to a limited application of the law without a basis of facts. * * *

Pursuant to said remand the case duly came on for hearing on June 12, 1939, at which time additional photographs of the machines constituting the imported merchandise at bar were admitted in evidence as Collective Exhibits 1-A, 2-A and 3-A. Whereupon the case was again submitted upon the following new stipulation, which was marked Exhibit 4-A.

IT IS HEREBY STIPULATED AND AGREED between counsel for the plaintiff and the Assistant Attorney General for the United States that:

1. The merchandise covered by this protest consists of one wet decatizing machine, two double nap raising machines and two cloth tenterizing machines.

2. All of these machines are in chief value of metal.

3. The wet decatizing machine consists of three vats, each of which is approximately 8' x 3' x 2'6''. Connected to each of these vats is a centrifugal pump driven by an electric motor directly connected. Over these three vats is a track upon which an overhead hoist runs. This hoist or traveling crane is driven by a directly connected electric motor to propel it along the tracks and the hoist consists of a revolving drum driven by a directly connected electric motor. Attached to the drum is a chain, to the end of which is connected a pair of tongs.

In addition to these parts of the machine there are six decatizing cylinders which consist of perforated copper cylinders, approximately 6'6'' long and 8'' in diameter. At one end of each of these cylinders there is a gear which when the cylinder is placed in position in the vat connects with a gear which is rotated directly by an electric motor.

There is also a device which rolls folded cloth on the perforated cylinders. This device is operated by an electric motor connected through a chain drive.

In addition, there is an extractor which consists of a vacuum pump driven by an electric motor through a silent chain drive. This motor, also through chain and gear mechanism, serves to rotate the perforated cylinder holding the cloth and also operates a folding mechanism which folds the cloth after it is unrolled from the cylinder.

In all, there were ten electric motors imported with this machine. Of these ten motors, eight are directly connected to the machine by means of couplings. The other two are connected to their units by chain drives.

The wet decatizing machine processes wool cloth which has been woven but which has not yet been napped or dyed. The cloth comes to the decatizing machine folded. The unfolding and winding-on mechanism referred to above winds the cloth about the perforated cylinders free from folds and wrinkles. When the machine is ready for operation, the first of the vats above referred to is filled with water of a temperature of 170° Farenheit. The second vat is filled with water at a somewhat lower temperature and the third vat is filled with water at room temperature. The purposes of the decatizing process are to set the fibres in the cloth; to make a smooth surface; and to prepare the cloth for the napping or teaseling process. The perforated cylinder about which the cloth to be processed has been wound is lifted by means of the overhead hoist and transported to the first vat where it is lowered into the water and the ends of the cylinder locked into the rotating mechanism described above, and at the same

time is connected with the centrifugal pump referred to above. The electric motor which is connected to the rotating gear is then started as well as the motor activating the centrifugal pump and the water in the vat is alternately circulated through the cloth in two directions. This first step in the process takes some fifteen minutes, whereupon the perforated roller holding the cloth is by means of the electric hoist removed from the first vat and placed in the second and third vats where the same process is performed. When the cloth on the perforated roller is removed from the vats by means of the electric hoist, it is then placed by means of the electric hoist into a cradle which is a part of the extracting unit. The suction pump referred to above then serves to extract the water from the cloth as the cloth is unwound from the perforated roller while passing over guide rollers and a vacuum slot to the folding mechanism where it is folded into approximately the same position as it was when the process started. Two photographic views of this wet decatizing machine are hereto attached and marked "Collective Exhibit 1–A".

4. Each of the two nap raising machines covered by this protest consists of two revolving cylinders approximately 3' in diameter and 6' wide. The surface of each of these rolls is fitted with twenty-four rows of teasel holding slots into which are placed teasels. An electric motor is coupled directly to one of these rolls and drives the other by means of gears. The electric motor and control for the same are designed for retarded starting of the equipment to prevent damage to the cloth. This is accomplished by insertion of a resistance in one phase of the three phase power circuit. This resistance is controlled by an electrically operated relay. The nap raising machines serve the purpose of creating a nap on the surface of the cloth which is accomplished by the action of the teasels coming into contact with the cloth. The cloth comes to the nap raising machine from the wet decatizing machine and prior to dyeing. Attached hereto are two different photographic views, marked "Collective Exhibit 2–A", of one of the nap raising machines showing some of the details of the electric drive.

5. The tenterizing machines imported serve by means of a drying process to remove from the cloth as it comes from the dyeing operation some 85% of the excess moisture contained in the cloth. This is accomplished by passing the cloth through a drying chamber where heated air is circulated by means of electrically driven fans. After the cloth leaves the tenterizing machine it goes through a number of other processes before it is finished, such as steaming, shrinking and conditioning. Each of the tenterizing machines imported consists of a drying chamber approximately 21'6" long, 8' wide and 13' high. Outside of the drying chamber is a feeding-in mechanism which receives the cloth which is in folds on a hand truck and which attaches it to a moving belt on each selvage which in turn conveys it through a drying chamber. The mechanism which attaches the cloth to the conveying belts is operated by two electric motors. Since the cloth as it comes to the machine varies in some slight degree in width, the attaching mechanism is so constructed as to automatically compensate for the variations in width and attach each section of the selvage to the conveying belts. In order to accomplish this result, the attaching mechanism automatically moves from side to side upon the shaft upon which it is mounted. The conveying belts are motivated by the main drive electric motor of the machine which is coupled by means of gears to nine intermediate drive shafts which in turn operate the conveying belts and serve to convey the cloth through the drying chamber. In addition to the electric motors already described, there is an electric motor which is connected to the sides of the drying chamber by means of gears and which serves to narrow or widen the width of the drying chamber and feeding mechanism in order to accommodate cloth of different widths. In addition to these

electric motors there are two electric motors which by means of belts drive four fans. These fans serve to circulate hot air through the courses of cloth passing through the drying chamber. When the cloth emerges from the drying chamber it is folded on a hand truck by means of a folding mechanism operated by the main drive motor through gears and belts. Attached hereto is a photographic view, marked "Exhibit 3–A", of one of the tenterizing machines.

6. None of the machines described could be operated by any other source of power than the electric motors described in detail above without such alterations as would necessitate a complete redesigning of the machines and the addition of many mechanical features.

It is further stipulated and agreed, subject to the approval of the Court, that the attached photographs marked "Collective Exhibit 1–A", "Collective Exhibit 2–A", and "Exhibit 3–A", may be received in evidence as Collective Exhibit 1–A, Collective Exhibit 2–A and Exhibit 3–A.

The facts in the case being thus agreed upon, the sole question at issue is one of law, namely, are the present imported mechanisms more specifically classified as "textile machinery" under the *eo nomine* provision therefor in paragraph 372 than as "articles having as an essential feature an electrical element or device" as provided in paragraph 353? It is at once apparent that the initial word "articles" in the latter provision may well embrace an infinite variety of things including numerous mechanisms electrically constructed, whereas in paragraph 372 the dutiable subject comprises only a single class of machines, to wit, textile machinery. Moreover the latter term has itself been judicially interpreted and has been limited· in its scope so that it does not include machines which merely clean textile material. *Passaic Worsted Co. et al.* v. *United States*, 17 C. C. P. A. 459, T. D. 43916. To hold as sound the contention of counsel for the plaintiffs would further materially curtail its application by excluding from the provision all machines elsewhere *eo nomine* provided for which are essentially electrical in construction. Inasmuch as most factory machines are now run by electricity, in the absence of some manifestation of such congressional intent, we would be reluctant so to hold. Moreover such a conclusion would be contrary to our decisions in previous cases.

In *W. W. Erskine* v. *United States*, Abstract 25013, 64 Treas. Dec. 847, counsel for the respective parties stipulated that the involved merchandise consisted of "printing machinery (not for textiles) having an electric motor incorporated therein as a part thereof, that metal is the component of chief value and that the protest may be submitted." Of such merchandise we said:

Since these rotary duplicators are concededly "printing machinery" (not for textiles), and as such specifically and *eo nomine* provided for, we think such provision takes precedence over the general descriptive language of paragraph 353 even though such printing machinery may be operated by electric motors. In other words, we consider the *eo nomine* provision for such machinery more specific therefor than the provision in paragraph 353.

As literally enacted, the provision there construed called for "printing machinery (except for textiles)." The exception made is significant, because otherwise it is highly questionable whether machines which print textiles could properly be excluded from the comprehensive provision for printing machinery.

In *Arnold* v. *United States*, 147 U. S. 494, 499, a case which involved the question whether certain knit woolen shirts, drawers, and hosiery came within the enumeration of "clothing, ready-made, and articles of wearing apparel of every description, made up or manufactured wholly or in part * * * of wool," Mr. Justice Brewer said:

* * * In *Brown* v. *Maryland* (12 Wheat. 419, 438), Chief Justice Marshall recognized as "a rule of interpretation, to which all assent, that the exception of a particular thing from general words proves that, in the opinion of the law-giver, the thing excepted would be within the general clause had the exception not been made." Applying that rule it follows that but for the exception the general description of "clothing, ready made, and wearing apparel" would include knit goods. * * *

In *Marr Duplicator Co.* v. *United States*, T. D. 48569, 70 Treas. Dec. 408, a certain rotary duplicating machine for producing printed circulars and like matter was held to be properly dutiable at the rate of 25 per centum ad valorem under the *eo nomine* provision in paragraph 372 of the Tariff Act of 1930 for printing machinery, rather than at 35 per centum ad valorem under paragraph 353 of said act as articles having as an essential feature an electrical element or device. We there said:

The facts being undisputed, the only question to be determined is one of law. It is at once apparent that the imported device is a printing machine as well as an article having as an essential feature an electric element. Either provision would apply in the absence of the other. It is, then, merely a question of relative specificity. As we read the law, the electrical provision must yield to the *eo nomine* designation covering printing machinery, because the latter is unrestricted, except where the machines print on textiles. There is no warrant for likewise excluding from such *eo nomine* provision a printing machine merely because it may be operated by electricity. The Congress precluded any such interpretation by providing for only such electrical articles as are not elsewhere specially provided for. Hence, the various machines which are specially provided for in paragraph 372 may not be taken from such special provisions solely because they may be electrical in character or operated by electricity. The legislative intent in the premises is preserved intact by the insertion in the electrical paragraph of the clause "not specially provided for."

In their brief filed herein, counsel for the plaintiffs seek to distinguish the last-cited case. They point out that the two considerations which were present in that case are not involved herein, saying:

* * * In the first place, the provision for printing machinery was not accompanied by the words "not specially provided for." The textile machinery provision is accompanied by the words "not specially provided for." Therefore, the two provisions "not specially provided for" in Par. 372 and in Par. 353 cancel each other, if, indeed, as above contended, the words in the electrical paragraph

at least do not mean otherwise provided for *as such*, that is, as electrical instruments. In the second place, Par. 353 specifies particularly that printing machinery for electrical telegraph apparatus should be covered by the paragraph.

A mere reading of other provisions in said paragraph 372 makes clear the need for adding to "textile machinery" the words "not specially provided for." Obviously, one of the purposes was to preserve intact the integrity of certain classifications made at the same or different rates for named classes of textile machines, such as sewing machines, embroidery machines, lace-making machines, machines for making lace curtains, nets, and nettings, and knitting, braiding, lace-braiding, and insulating machines. The manifest legislative intent was that such special provisions should not be distrubed.

To adopt the interpretation urged by counsel for the plaintiffs would, we believe, defeat the obvious purpose designed to be accomplished by the electrical paragraph, to wit, to favor the electrical industry. Some benefit might accrue to it by removing from the provision in paragraph 372, for machines not specially provided for, mechanisms which are electrically constructed, thus increasing the duty from 27½ to 35 per centum ad valorem. But the opposite would be true where the electrical machines are already provided for at a higher rate than 35 per centum ad valorem. For instance, textile machinery electrically constructed would pay a less rate of duty than nonelectrical textile machinery. And this would be true of other *eo nomine* provisions for certain machines.

We are therefore of the opinion that the provision for textile machinery in paragraph 372 of the Tariff Act of 1930 is more specific than the general provision in said paragraph 353 for articles having as an essential feature an electrical element or device.

Moreover, if the contention of counsel for the plaintiffs should prevail in the instant case, it would necessarily follow that every named article in the metal schedule of the Tariff Act of 1930 which has as an essential feature an electrical element or device would be transferred to paragraph 353. Manifestly such was never the intent of the Congress. In case the appellate court should hold that paragraphs 353 and 372 are equally specific, then it must be held that the machines in question are dutiable at the higher rate by virtue of the following provision in paragraph 1559 of the Tariff Act of 1930, "If two or more rates of duty shall be applicable to any imported article, it shall be subject to duty at the highest of such rates."

On the established facts and the law applicable thereto we hold that the machines constituting the imported merchandise at bar, and parts thereof, are properly dutiable at the rate of 40 per centum ad valorem under said paragraph 372 as textile machinery and parts thereof not specially provided for, as classified by the collector.

All claims of the plaintiffs are therefore overruled. Judgment will be rendered accordingly.